**FILED**
**CLERK**

10/19/2015 2:05 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
AMPHORA OIL & GAS CORP.,

                    Plaintiff,

     -against-

CUMBERLAND FARMS, INC., GULF OIL
LIMITED PARTNERSHIP and 750 MOTOR
PARKWAY REALTY LLC,

                    Defendants.
----------------------------------------------------------------x

**MEMORANDUM OF**
**DECISION AND ORDER**
15-cv-4638(ADS)(AYS)

**APPEARANCES:**

**AMANATIDES KOCHISARLI PLLC**
*Attorneys for the Plaintiff*
125 Jericho Turnpike, Suite 303
Jericho, NY 11753
        By:   Alexander M. Amanatides, Esq., Of Counsel

**SHIPMAN & GOODWIN LLP**
*Attorneys for the Defendants Cumberland Farms, Inc. and*
   *Gulf Oil Limited Partnership*
One Constitution Plaza
Hartford, CT 06103
        By:   Vaughan Finn, Esq., Of Counsel

**ROBINSON & ASSOCIATES, P.C.**
*Attorneys for the Defendant 750 Motor Parkway Realty, LLC*
35 Roosevelt Avenue
Syosset, NY 11791
        By:   Kenneth L. Robinson, Esq., Of Counsel

**SPATT, District Judge:**

This case arises under the federal Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA").

On August 7, 2015, the Plaintiff Amphora Oil & Gas Corp. (the "Plaintiff" or "Amphora") commenced this action against the Defendants Cumberland Farms, Inc. and its subsidiary Gulf Oil Limited Partnership (together, "Cumberland Gulf") and 750 Motor Parkway Realty LLC ("Parkway Realty"), to enforce its rights under certain lease and franchise agreements relating to the Plaintiff's operation of a Gulf-branded retail gasoline service station in Brentwood, New York (the "Service Station"). By this action, the Plaintiff seeks various declaratory, injunctive, and monetary relief under the PMPA.

Presently before the Court is a motion by the Plaintiff, brought by Order to Show Cause ("OTSC"), which seeks a preliminary injunction preventing the Defendants from interfering with Amphora's operation of the Service Station; terminating the subject lease and franchise agreements; and tolling the relevant time periods set forth in those agreements during the pendency of this litigation.

On October 16, 2015, the parties appeared before the Court for a hearing on the OTSC. Following the hearing, the Court reserved decision on the Plaintiff's motion.

For the reasons that follow, the Court now denies the Plaintiff's motion for a preliminary injunction in its entirety.

# I.    Background

The following facts are drawn from the complaint and any evidence submitted in connection with the instant motion.

## A.    The Master Lease

The Service Station is situated on real property located at 750 Vanderbilt Motor Parkway in Brentwood.  In 2001, the landlord of that property was one Joseph Zanghi ("Zanghi").

On January 1, 2001, Zanghi entered into a Site and Facilities Lease (the "Master Lease") with an entity known as Tosco Refining L.P.  A copy of the Master Lease is in the record as Exhibit "1" to the August 6, 2015 Affidavit of Oguz Kurtoglu in support of the instant motion (the "Kurtoglu Aff.").

The following provisions of the Master Lease are allegedly relevant here:

4. **TERM**

4.1. Initial Term.  The "Initial Term" of this Lease shall coincide with the Primary Term identified in this lease.

4.2. Primary Term.  The "Primary Term" shall commence on January 1, 2001 . . . and shall end at midnight on December 31, 2015. The Primary Term may be extended as provided herein.  . . .

4.4. Extended Terms.  As a further material consideration for the execution of this Lease, Tenant is hereby granted the irrevocable, exclusive right and option to extend the Primary Term upon the same terms, covenants and conditions, and for the same rental as set forth [there]in . . . for four (4) additional, consecutive terms of such number of years not to exceed five (5) years each ("Extended Terms"), as Tenant may declare.  At least ninety (90) days prior to the expiration of the Lease Term then in effect, Tenant shall provide Landlord with written notice of each election to extend the Lease Term, together with the declared term of such extension.

\*       \*       \*

11. **ASSIGNMENT & SUBLETTING.** Tenant may sublet the Leased Premises, or any part thereof, or assign the Lease to any person or entity for any lawful purpose as long as Tenant is not in default of any provision of this Lease and the subtenant or assignee agrees to be bound by or assume all obligations of the Lease. *No subletting or assignment shall relieve Tenant of its obligations hereunder to Landlord.*

 Tenant shall give notice within ninety (90) days of any such subletting or assignment to Landlord. Landlord shall give similar notice of any sale or assignment of its interest in this Lease to Tenant. Such notice by either party shall include appropriate documentation evidencing the sale or assignment, including, but not limited to, copy of the recorded deed, copy of the assignment of lease, and a W-9 form (if applicable).

<u>See</u> Kurtoglu Aff., Ex. "1" (emphasis supplied).

The parties dispute the meaning of the emphasized text above (the "Assignment Provision"). The Defendants contend that the phrase "[n]o . . . assignment shall relieve Tenant of its obligations hereunder to Landlord" means that "in the event of an assignment, the tenant remained liable for payment of rent and other financial obligations, remediating environmental contamination, and other liability resulting from the assignee's operation of the Premises." <u>See</u> Cumberland Gulf Opp. Memo at 3; <u>see also</u> Sept. 14, 2015 declaration of Mark Russell (the "Russell Decl.") ¶ 6 (same). By contrast, the Plaintiff focuses on the use of the word "its" to argue for a narrow interpretation. The Plaintiff contends that, in the event of an assignment, the tenant would only be liable for *its own* obligations under the Master Lease and would not be responsible for guarantying the assignee's performance. <u>See</u> Pl. Reply Memo at 3 ("[T]he assignment provision of the Master Lease neither states nor requires the Tenant to be liable to the

Landlord for, or to guaranty, the new tenant/assignee's obligations under the Master Lease after the date of the assignment").

In any event, through a series of mergers, the original tenant under the Master Lease, Tosco Refining L.P., eventually became known as ConocoPhillips Company ("ConocoPhillips"). On September 10, 2003, ConocoPhillips assigned the lease to the Defendant Cumberland Gulf pursuant to an Assignment and Assumption of Lease. Thus, as of that date, the parties to the Master Lease were Zanghi, as landlord, and Cumberland Gulf, as tenant.

According to the complaint, since September 10, 2003, Cumberland Gulf has been the tenant under the Master Lease and the underlying property has been utilized as a gas station and convenience store.

## B.      The Sublease

On April 5, 2004, Amphora entered into a Retail Motor Fuel Outlet Lease (the "Sublease") with Cumberland Gulf. An executed copy of the Sublease is in the record as Exhibit "3" to the Russell Declaration. The Sublease contains the following relevant provision:

> 2. **TERM**: The term of this lease shall begin at noon on the 10th day of September, 2012, and terminate at noon on the 9th day of September, 2015, unless the prior Lessee has not relinquished possession of the premises to Lessor by the above-mentioned beginning date, in which event this Lease shall be null and void and Lessor shall not be liable to Lessee in any manner as a result thereof. It is understood and agreed that any holding over by Lessee at the end of this Lease, or at the end of any extension period, without this Lease having first been renewed or extended in writing, shall not be  considered as a renewal of this Lease, but this Lease shall instead continue on a month-to-month basis. . . .

See Russell Decl., Ex. "3".

The Plaintiff asserts that the Sublease has been extended on three separate occasions, most recently on September 10, 2012. Consistent with this assertion, a copy of the executed Sublease, dated September 10, 2012, is in the record. See id.

Amphora also entered into certain related agreements with Cumberland Gulf, including a Dealer Contract of Sale, which agreements collectively constitute a franchise agreement. These agreements are in the record as Exhibit "4" to the Russell Declaration. It is undisputed that the parties' franchise agreement is subject to the federal PMPA.

According to Cumberland Gulf, attached to the Sublease was a document entitled "Notice of Underlying Lease." This notice, which Cumberland Gulf asserts complies with Section 2802(b)(2)(C) of the PMPA, informed Amphora that the Sublease was subject to the Master Lease; that the Master Lease might expire and not be renewed; and that, in this event, the Sublease and franchise agreement would also end. See Russell Decl. ¶ 9 & Ex. "5".

It is undisputed that the Sublease and franchise agreement were due to expire on September 9, 2015. The Plaintiff asserts that the Sublease's three-year term was "automatically renewed as required by and subject to PMPA," so long as none of the grounds for termination or nonrenewal set forth in the PMPA occur. See, e.g., Compl. ¶¶ 32-33; Kurtoglu Aff. ¶ 21. In this regard, the Plaintiff appears to contend that, on September 9, 2015, the Sublease and franchise agreements were automatically renewed, as none of the grounds for termination under the PMPA had occurred.

However, this position is placed in question by the evidence in the record, including a copy of the Sublease and related documents, which were executed on September 10, 2012. The parties' execution of lease renewal documents undermines the idea that the Sublease was "automatically renewed." Similarly, this contention is inconsistent with the plain language of the Sublease, which specifically requires any renewal or extension of the Sublease to be in writing or else the leasehold continues on a month-to-month basis. The Plaintiff has not identified any contract language to support its automatic renewal proposition. Nor has it provided any citation to the section of the PMPA that purportedly "requires" such automatic renewal.

## C.  The Facts Relating to Oguz Kurtoglu

Kurtoglu is the President of the Plaintiff Amphora. In support of the instant motion, he submitted an affidavit, which sets forth the following relevant facts.

Prior to April 2004, Kurtoglu was a Turkish resident and applied for a United States E-2 Investment Visa. This type of Visa is issued to nationals of certain treaty countries who enter the United States to develop and manage a business enterprise into which they have invested or are committed to invest a substantial amount of capital. Kurtoglu states that, in order to obtain and remain compliant with his E-2 Visa, he must actively manage a business enterprise in which he has invested a substantial amount of money. He asserts that the Service Station at issue in this case satisfied the visa requirements.

**D.    Cumberland's Non-Renewal Decision**

On December 8, 2014, one Alison Welton, Cumberland Gulf's Leasing and Acquisitions Manager, sent a letter to Zanghi (the "Welton Letter"), stating that Cumberland Gulf "d[id] not intend to renew [the Master L]ease and therefore it shall expire on December 31, 2015." See Kurtoglu Aff., Ex. "9".

Mark Russell, Cumberland Gulf's Director of Real Estate Property Management, stated in his opposing affidavit that Cumberland Gulf's decision was grounded in unspecified "business reasons." See Russell Aff. ¶ 10.

**E.    The Termination of the Franchise**

On December 22, 2014, two weeks after Cumberland Gulf advised the landlord of its intention not to extend the Master Lease, one Kevin Cummins, Cumberland Gulf's Region Director for Sales Operations and Property Management, sent a letter to Amphora (the "Termination Notice"). According to Russell, the Termination Notice was sent by certified mail, return receipt requested, regular mail, and hand delivery. See id. ¶ 14. However, Kurtoglu allegedly refused to accept the hand delivery or to sign the Notice, as requested. See id. A return receipt for the copy sent via certified mail indicates that the Notice was received by Amphora on December 26, 2014. See id., Ex. "8".

The Termination Notice provides, in pertinent part, as follows:

> This letter will serve as written notice that Gulf has elected not to extend its lease at the above mentioned property. Gulf hereby notifies you, in accordance with provisions of the [PMPA] that your franchise relationship and all related Agreements with Gulf will terminate and not be renewed effective **September 9, 2015**.

Also, in accordance with the P.M.P.A., Gulf hereby informs you that it possesses a contractual right to extend the underlying lease for four (4) additional five (5) year periods. While Gulf has elected not to exercise its contractual rights, if you so desire, Gulf will attempt to assign to you its right to extend the underlying lease <u>provided</u> that you provide to Gulf, **prior to Friday, July 31, 2015** the following:

> 1. An unconditional release of Gulf, executed by you and Joseph Zanghi . . . from any and all liability accruing after the date upon which Gulf's rights under the underlying lease are assigned to you for:
>
> > a. financial obligations arising under the extended underlying lease;
> > b. environmental contamination to, or originating from the premises; and
> > c. the operation of the premises.
>
> 2. An agreement, executed by you and Joseph Zanghi that ensures Gulf and its contractors reasonable access to the premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises **prior to Friday, July 31, 2015**.
>
> In the event you fulfill the foregoing conditions, and as a result acquire the right to possession of the premises effective immediately after Gulf's possession, Gulf will, if you so request in writing within thirty (30) days of your receipt of this Notice, make a bona fide offer to sell, transfer, or assign its interest in the improvements or equipment located on the premises.

<u>See</u> Kurtoglu Aff., Ex. "4" (emphasis in original).

Cumberland Gulf's insistence upon an unconditional release from ongoing liability after the date of the assignment appears to be in response to its interpretation of the Assignment Provision contained in the Master Lease. However, as discussed more fully below, notwithstanding the parties' diverging interpretations of the Assignment Provision, the PMPA expressly permits

Cumberland Gulf to demand an unconditional release of the type described in the Termination Notice.

**F.     The Exercise Notice**

On May 22, 2015, Amphora, through counsel, sent a letter (the "Exercise Notice") to Cumberland Gulf, stating that the Plaintiff "elect[ed] to exercise its right to assume the remaining options to extend the Lease to the Marketing Premises." See Kurtoglu Aff., Ex. "5". The notice further stated that "Amphora is ready, willing and able to comply with all terms and conditions of the PMPA relative to the assignment and assumption of the Lease." Id.

Approximately one week later, on May 28, 2015, one Timothy Brooks, Cumberland Gulf's Director of Corporate Administration, sent a response letter to Amphora. The letter acknowledged receipt of the Exercise Notice, but reiterated that, as set forth in the Termination Notice, in order to properly exercise its rights in this regard, certain materials, including and especially the unconditional release from ongoing liability, were required to be provided by Amphora to Cumberland Gulf by July 31, 2015. The letter cautioned that, "[i]f Gulf does not receive the above-referenced documents by Friday, July 31, 2015, then, in accordance with the [Termination] Notice, it will expect your client [Amphora] to voluntarily and peacefully vacate the premises and end our franchise relationship on or before September 9, 2015." See id.

The Plaintiff asserts that, between June 3 and June 15, 2015, Brooks, the author of the May 28, 2015 letter, directed Amphora to communicate directly with

the landlord under the Master Lease regarding the proposed assignment from Cumberland Gulf to Amphora.

**G.     The Rejection by Parkway Realty**

Apparently, in late 2014 or early 2015, Zanghi, the original landlord, sold the premises to the Defendant 750 Motor Parkway Realty LLC.  As a result, Parkway Realty succeeded Zanghi as landlord under the Master Lease.

On June 15, 2015, Amphora, through counsel, sent a letter to one Nehal Tivendi, the managing member of Parkway Realty.  The letter stated, in relevant part, that, "under the [PMPA] Amphora has a statutory right to assume the remaining options to extend the lease to the [Gas Station property], which it exercised by notice dated May 21, 2015."  See Kurtoglu Aff., Ex. "7".  The letter enclosed four copies of a proposed Assignment and Assumption of Lease for Parkway Realty's review and execution.  The proposed assignment included a proposed unconditional release of Cumberland Gulf, as required by the Termination Notice.  See Kurtoglu Aff., Ex. "7" at ¶ 10.  An e-mail containing identical language and attachments was also sent by Amphora to Tivendi on that date.

On June 18, 2015, Tivendi, who is an attorney, sent a responsive e-mail to Amphora's counsel, with a copy to Cumberland Gulf's Director of Corporate Administration, Timothy Brooks (the "Rejection Notice").  The Rejection Notice stated that Parkway Realty "will not execute the Assignment and Assumption of Lease."  See Kurtoglu Aff., Ex. "8".  Further, the Rejection Notice stated that "Cumberland Farms Inc. is the tenant.  Cumberland Farms has declined to extend

the lease beyond December 31, 2015.  Accordingly 750 Motor Parkway LLC does not wish to offer the option to your client [Amphora] to extend the lease." Id.  The Court notes that, despite Amphora's apparent willingness to assume Cumberland Gulf's responsibilities under the Master Lease and to provide Cumberland Gulf with the unconditional release that it requested, the Rejection Notice did not specify Parkway Realty's reasons for declining to consent to the assignment of the Option Term from Cumberland to Amphora.

Subsequently, on or about July 1, 2015, Tivendi furnished to Amphora a copy of the Welton letter, in which Cumberland Gulf gave notice to Zanghi, Parkway Realty's predecessor, of its intention to let the Master Lease expire on December 31, 2015.

In its briefing and arguments in opposition to the instant motion, Parkway Realty's position concerning Amphora's proposed extension of the Master Lease has come into sharper focus.  According to an affidavit submitted by Tivendi, "[t]here is no economic reason for [Parkway Realty] to substitute Plaintiff, which apparently has only one lease as an asset[,] for Gulf as a responsible party under the Master Lease." See Tivendi Decl. ¶ 18 (internal citation omitted).  For this reason, Parkway Realty asserts that it "did not and would not have agreed to the terms and conditions of [the proposed] Assignment and Assumption agreement" circulated by Amphora on or about June 15, 2015.

Consistent with these assertions, Mark Russell, Cumberland Gulf's Director of Real Estate Property Management, states that, on July 8 and 9, 2015, he spoke

directly with Parkway Realty's principals, namely, Tivendi and his business partner, Bill Blau, who indicated that they would not agree to any assignment of the Option Term that unconditionally released Cumberland Gulf from ongoing liability. <u>See</u> Russell Aff. ¶ 21. In this regard, both men indicated to Russell that Parkway Realty "would never have agreed to an assignment that relieved Gulf of ongoing liability because Amphora, a small operator with few resources, would not have been able to provide the same level of protection as Gulf." <u>Id.</u>

The gravamen of the Plaintiff's current position is that, because Parkway Realty did not consent to an assignment of the Option Terms from Cumberland Gulf to Amphora, it will be wrongfully displaced from the premises and forced to discontinue operating the Service Station in accordance with the Master Lease; the Sublease; and the relevant franchise agreements. Despite the Plaintiff's reliance upon a purported "automatic renewal," there appears to be no real dispute that the subject franchise terminated on September 9, 2015. However, in connection with the instant motion, the parties stipulated to maintain the status quo until October 30, 2015.

## H.    The Instant Action

Based on the allegations outlined above, Amphora commenced the instant action, seeking the following relief: (i) a declaratory judgment that Amphora timely exercised its right to assume the Option Terms under the Master Lease, and that Parkway Realty has wrongfully failed and refused to recognize Amphora's rights under the PMPA; (ii) in the alternative, a declaratory judgment that, by sending the

Welton Letter, Cumberland Gulf "undermined Amphora's right to maintain its business at the" Service Station, in violation of the PMPA; (iii) a permanent injunction preventing Cumberland Gulf from terminating or failing to renew the Master Lease, Sublease, and related franchise agreements, and tolling the applicable time periods set forth in those agreements until a final determination is reached on the merits of this case; (iv) actual and exemplary damages, and reasonable attorneys' and expert witness fees, under the PMPA.

The instant motion seeks preliminary relief that mirrors the third cause of action described above, namely, an order preventing Cumberland Gulf from terminating or failing to renew the Master Lease, Sublease, and related franchise agreements, and tolling the applicable time periods set forth in those agreements during the pendency of this litigation.

As noted above, on or about August 26, 2015, the Court approved a proposed amended briefing schedule, which, among other things, temporarily enjoined the Defendants from engaging in the activities identified in the OTSC through October 30, 2015.

## I. The Additional Allegations in the Amended Complaint

The Court notes that, while the instant motion was pending, Amphora filed an amended complaint, which is now the operative pleading in this action. The amended complaint adds the following relevant allegations.

On September 12, 2014, Parkway Realty entered into a new lease for the Gas Station with an entity called Bolla Operating L.I. Corp. ("Bolla"). The Court will refer to this new lease as the "Bolla Lease."

It is alleged that, by entering into the Bolla Lease, Parkway Realty violated a provision of the Master Lease, which provides, in relevant part, as follows:

> Tenant [Cumberland Gulf] shall have the preferential right to purchase, lease or accept an assignment of an option or contract to purchase or lease the Leased Premises and/or the Facilities during the Lease Term. *Landlord [Parkway Realty] agrees not to sell or lease all or any portion of the Leased Premises without first giving Tenant written notice of each proposed sale or lease (which notice shall include a copy of the proposed sale of lease document subject to Tenant's rights hereunder) stating therein the price, rent, and all other terms and conditions thereof.* If the Leased Premises are being sold or leased as a part of a larger parcel of property, Tenant's rights hereunder shall extend only to the purchase or lease of the larger preferential right to purchase, lease or accept an assignment of an option or contract to sell or lease the Leased Premises at the rent or the price and upon the term and condition set forth in the notice. Tenant shall have ninety [60] [*sic*] days after receipt of such notice to notify Landlord that Tenant elects to exercise such right granted under this Section 15.

See Kurtoglu Aff., Ex. "1" (emphasis supplied).

In this regard, Amphora asserts that Parkway Realty entered into the Bolla Lease without first giving Cumberland Gulf the requisite written notice and an opportunity to exercise a preferential right to that new lease. In addition, the Plaintiff appears to contend that the PMPA requires Cumberland Gulf, in turn, to offer its preferential interest in the Bolla Lease to Amphora. The Plaintiff asserts that, in the event this Court finds that it is so entitled, it is ready, willing, and able to assume Cumberland Gulf's preferential rights, and to enter into the Bolla Lease.

Based on these additional allegations, the amended complaint adds a hybrid injunction/declaratory judgment cause of action seeking to declare and compel Parkway Realty to furnish to Cumberland Gulf the required written notice of the Bolla Lease; declaring and compelling Cumberland to assign its preferential rights to the Bolla Lease to Amphora; and declaring and compelling Parkway Realty to recognize Amphora as the tenant under the Bolla Lease.

Parkway Realty readily concedes that it entered into the Bolla Lease. In this regard, Trivedi, Parkway Realty's managing member, states that, on December 8, 2014, when Cumberland Gulf advised it of its intention not to extend the Master Lease, Parkway Realty began negotiations with Bolla. Trivedi states that:

> When Gulf vacates the Premises, it is my understanding that Gulf will remove the canopy, underground petroleum storage tanks and possibly the building. Bolla plans to install a new canopy, three (3) two thousand (20,000) [*sic*] gallon underground petroleum storage tanks and a 2500 to 300 [*sic*] square foot convenience store with a gourmet delicatessen area. . . . Paragraph 9.2 of the Bolla lease provides that all improvements and alterations made by Bolla to the Premises becomes the property of [Parkway Realty] at the expiration or termination of the Lease.
> . . . If [Parkway Realty] can not [*sic*] provide timely possession of the Premises to Bolla, it is very likely that Bolla will terminate the Bolla Lease. As a result, [Parkway Realty] would lose the substantial value of the improvements to be made to the Premises by Bolla. [Parkway Realty] would also lose a tenant with a substantial net worth, especially compared to Plaintiff.

<u>See</u> Sept. 16, 2015 Declaration of Nehal Trivedi, Esq. ("Trivedi Decl.") at ¶¶ 26, 28.

Based on these circumstances, Parkway Realty asserts that, if the Court grants a preliminary injunction, Amphora should be required to post security in the amount of $758,000. At oral argument, counsel for Parkway Realty stated that this

amount reflects the investment that Bolla is prepared to make in the Service Station. Consistent with this assertion, Parkway Realty offered a document, prepared on the letterhead of an entity known as Bolla Construction, LLC, which counsel represented is the construction arm of the Bolla organization. The document, which is signed by one Harry Singh, the President of Bolla Construction, LLC, purports to demonstrate the scope of estimated construction costs at the Service Station, which total $758,000. Over the Plaintiff's objection, the Court agreed to take this document into consideration, together with the other evidence in the record.

## II. Discussion

### A. The Applicable Legal Standards

Recognizing "the imbalance of power in favor of refiners and franchisors in the making, modifying, renewal and termination of contracts with franchisees," Congress enacted the PMPA, which establishes "certain requirements for termination or nonrenewal of a franchise." <u>California Petroleum Distrib., Inc. v. Chevron U.S.A., Inc.</u>, 589 F. Supp. 282, 285 (E.D.N.Y. 1984) (citing S. Rept. No. 95-731, 95th Cong., 2d Sess. 1, <u>reprinted in</u> 1978 U.S. Code Cong. & Ad. News 875-76; 15 U.S.C. § 2802); <u>see</u> <u>Darling v. Mobil Oil Corp.</u>, 864 F.2d 981,983 (2d Cir. 1989) ("In broad terms, the PMPA was enacted to establish federal standards regarding the termination and nonrenewal of petroleum marketing franchises. . . . Its overriding purpose is to establish protection for franchisees from arbitrary and

discriminatory terminations or non-renewals of their franchises" (internal citation and quotation marks omitted)).

"In keeping with its legislative purpose, the PMPA contains a general prohibition against termination of a franchise or nonrenewal of a franchise relationship by a franchisor, except upon specified preconditions and grounds." <u>MS & BP, LLC v. Big Apple Petroleum, LLC</u>, 14-cv-5675, 2015 U.S. Dist. LEXIS 61011, at *14 (E.D.N.Y. May 8, 2015) (citing 15 U.S.C. § 2802(b)(1)). In particular, the statute provides, in relevant part, as follows:

> (2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:
>
>     \*      \*      \*
>
> (C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—
> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 104(a) [15 U.S.C.§ 2804(a)]; or
> (ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 104(b)(1) [15 U.S.C. § 28014(b)(1)].

<u>See</u> 15 U.S.C. § 2804(a), (b)(2)(C).

The PMPA defines "an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." <u>See</u> <u>id.</u> § 2804(c). Relevant here, such an event includes the following:

(4) loss of the franchisor's right to grant possession of the leased marketing premises through expiration of an underlying lease, if—

    (A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—

        (i) of the duration of the underlying lease; and

        (ii) of the fact that such underlying lease might expire and not be renewed during the term of such franchise (in the case of termination) or at the end of such term (in the case of nonrenewal);

    (B) during the 90-day period after notification was given pursuant to section 104 [15 U.S.C. § 2804], the franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of—

        (i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for—

            (I) financial obligations under the option (or the resulting extended lease or purchase agreement);

            (II) environmental contamination to (or originating from) the marketing premises; or

            (III) the operation or condition of the marketing premises; and

        (ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; [ . . . ]

<u>Id.</u> § 2802(c)(4).

Where such an event is established, the Second Circuit conclusively presumes that the termination of a franchise or the nonrenewal of a franchise relationship which is predicated on that event is reasonable as a matter of law. <u>See</u> <u>Big Apple Petroleum, LLC</u>, 2015 U.S. Dist. LEXIS 61011, at *16-*17 ("Once having ascertained that an event is encompassed by one of the twelve enumerated events, a

court need make no further inquiry as to the reasonableness of the termination" (quoting Russo v. Texaco, Inc., 808 F.2d 221, 225 (2d Cir. 1986)).

The PMPA creates a right of action for franchisees against franchisors who fail to comply with the requirements of 15 U.S.C. § 2802. In particular, "Congress enacted an enforcement section that provides for the grant of a preliminary injunction by the federal courts on a somewhat lesser showing of cause than is usual for such equitable relief." California Petroleum Distrib., Inc., 589 F. Supp. at 285 (citing 15 U.S.C. § 2805(b)(2)). The statute provides that the district court shall grant a preliminary injunction if:

> (A) the franchisee shows—
> (i) the franchise of which he is a party has been terminated or the franchise relationship of which he is a party has not been renewed; and
> (ii) there exist sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

15 U.S.C. § 2805(b)(2).

As noted above, "[t]he Second Circuit recognizes this burden as less severe than is generally required under Rule 65 of the Federal Rules of Civil Procedure." Big Apple Petroleum, LLC, 2015 U.S. Dist. LEXIS 61011, at *19-*20 (internal quotation marks and brackets omitted) (quoting Nassau Blvd. Shell Serv. Station, Inc. v. Shell Oil Co., 875 F.2d 359, 363 (2d Cir. 1989).

With this analytical framework in mind, the Court will now consider the parties' contentions.

**A.     The First Element – As to Whether Amphora's Franchise Has Been Terminated or Not Renewed**

In this case, the parties do not appear to dispute that the franchise relationship between Amphora and Cumberland Gulf was terminated by Cumberland Gulf on September 9, 2015.  <u>See</u> Cumberland Gulf Opp. Memo at 8 ("Nor is there any dispute that, on December 22, 2014, [Cumberland Gulf] notified Amphora that the franchise relationship would terminate on September 9, 2015").  Accordingly, the Termination Notice discussed above easily satisfies the first element of the PMPA's preliminary injunction standard.  "Thus, whether this Court will issue a preliminary injunction under section 2805 turns on whether there are sufficiently serious questions going to the merits to make such questions a fair ground for litigation."  <u>Big Apple Petroleum, LLC</u>, 2015 U.S. Dist. LEXIS 61011, at *22-*23.

**B.     The Second Element – As to Whether Sufficiently Serious Questions Exist Relating to the Merits of Amphora's Claims**

A closer question is presented by the second prong of the applicable standard, under which Amphora is required to show "a reasonable chance of success on the merits."  <u>Nassau Boulevard Shell Serv. Station, Inc. v. Shell Oil Co.</u>, 875 F.2d 359, 363 (2d Cir. 1989) (citation omitted); <u>see</u> <u>Persaud v. Exxon Corp.</u>, 867 F. Supp. 128, 137 n.4 (E.D.N.Y. 1994) ("In contrast to Rule 65, which requires a movant to show a strong or reasonable likelihood of success, the PMPA requires only that a franchisee show a reasonable chance of success on the merits" (quoting <u>Nassau Coulevard</u>, <u>supra</u>)); <u>Kajdan v. Exxon Co. U.S.A.</u>, 80-cv-126, 1980 U.S. Dist. LEXIS 9078, at *17-

*18 (D. Conn. Mar. 14, 1980) ("In order to satisfy this burden, plaintiff must present a significant showing of something that would constitute some reasonable chance of success" (internal citation and quotation marks omitted)).

At the heart of the Plaintiff's position is an alleged "right to assume the Option Terms" under the Master Lease from Cumberland Gulf. In particular, the Plaintiff appears to contend that it has an absolute right under the PMPA to assume any options that Cumberland Gulf held under the Master Lease, and further, that Parkway Realty's unwillingness to consent to such an assignment constitutes a violation of the PMPA. The Court disagrees.

As discussed more fully above, Section 2802(c)(4) of the PMPA provides that the expiration of an underlying ground lease may provide a basis for a franchisor's decision to terminate a franchise or its decision not to renew a franchise relationship if, *inter alia*, within 90 days of giving notice of such decision the franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the premises. Thus, despite Amphora's contentions, franchisees are not given an absolute right to assume an option contained in a lease agreement between its franchisor and the landlord of the premises. See Gun Hill Rd. Serv. Station v. ExxonMobil Oil Corp., 08-cv-7956, 2013 U.S. Dist. LEXIS 14199, at *57-*58 (S.D.N.Y. Feb. 1, 2013) (recognizing that the right of a franchisee to be assigned an option to extend a ground lease "is limited" in that the franchisor may condition the assignment upon receipt by the franchiser of an unconditional release of liability executed by the landlord and the franchiser; finding that "it d[id]

not appear that the PMPA granted [the franchisee] an unconditional right to stay on as the franchisee" of the service station in question).

Rather, the statute imposes upon the franchisor the obligation to *offer* to assign the option to its franchisee, a burden that Cumberland Gulf indisputably satisfied in this case. In the Court's view, the December 22, 2014 Termination Notice, which was received by Amphora on December 26, 2014, satisfied Cumberland Gulf's obligations under the PMPA. That notice clearly stated that, "in accordance with the P.M.P.A., Gulf hereby informs you [Amphora] that it possesses a contractual right to extend the underlying lease for four (4) additional five (5) year periods. While Gulf has elected not to exercise its contractual rights, if you so desire, Gulf will attempt to assign to you its right to extend the underlying lease . . ." The PMPA does not require anything more of Cumberland Gulf, and the Plaintiff has pointed to no legal authority to the contrary.

The Court's reasoning is not altered by the fact that Cumberland Gulf conditioned its assignment on an unconditional release of future liability. In this regard, as noted above, the parties dispute whether the Assignment Provision in the Master Lease actually requires Cumberland Gulf to remain liable for Amphora's performance under the contract in the event of as assignment. However, the Court need not decide that issue because, regardless of which party's interpretation prevails, the PMPA plainly authorizes Cumberland Gulf's conduct.

The relevant portions of the PMPA provide that a franchisor must "offer[ ] to assign to the franchisee any option to extend the underlying lease or option to

purchase the marketing premises that is held by the franchisor, *except that the franchisor may condition the assignment upon receipt by the franchisor of an executed release signed by both the landowner and the franchisee . . .*" 15 U.S.C. § 2802(c)(4)(B)(i) (emphasis supplied). In the Court's view, even if the Plaintiff's proposed interpretation of the Assignment Provision is correct, Cumberland Gulf is under no legal obligation to assign the Option Terms without first receiving an unconditional release of future liability as described in the statute. Further, it is clear that the content of the release demanded by Cumberland Gulf in the Termination Agreement, and reiterated in Brooks' May 28, 2015 letter, tracks the relevant statutory language almost verbatim. However, it is undisputed that Amphora did not, and indeed could not, obtain such a release from the landlord. Under these circumstances, the Court can discern no basis for concluding that the PMPA was violated.

Similarly, in the Court's view, Parkway Realty's failure to consent to an unconditional release of Cumberland Gulf, and, therefore, an assignment of the Option Term to Amphora, does not violate the PMPA. In this regard, counsel for the Plaintiff asserted at oral argument that the PMPA *requires* the landlord to sign off on the assignment of the Option Terms. However, the Plaintiff has pointed to no authority for such a proposition, and this Court's independent research has not revealed any. On the contrary, the plain language of the statute specifically authorizes the franchisor to condition its assignment of an option upon receipt of a release that is executed by the landlord. In the Court's view, this language

implicitly contemplates situations where, as here, the landlord declines to release the franchisor from future liability, and as a result, the franchisor declines to assign its option. Such a provision would be superfluous if, in every instance, the landlord was *required* to provide such a release. On the contrary, it is clear to this Court that Parkway Realty was within its rights to withhold its consent to the assignment, and in doing so, did not violate the PMPA.

In this regard, the evidence demonstrates that Cumberland Gulf decided not to extend the ground lease for business reasons; that Parkway Realty deemed it unacceptable for Amphora, a small enterprise allegedly without substantial resources, to continue in Cumberland Gulf's place as the sole responsible party for any liability arising from the operation of the Service Station; and that, accordingly, Parkway Realty declined to assent to the assignment of the Option Terms and, instead, entered into a new ground lease with Bolla, a large organization with substantial resources, not only for the continued operation of the Service Station, but also for the installation of extensive new facilities. Absent evidence to the contrary, the Court accepts these facts as reflections of the parties' legitimate business interests, and finds no basis for concluding that they violate the PMPA. See Kajdan, 1980 U.S. Dist. LEXIS 9078, at *17-*18 ("In applying this standard the Court's task is a narrow one—Congress did not intend for a court to substitute its business judgment for that of the franchisor").

In reaching this conclusion, the Court rejects an argument that the Plaintiff made for the first time in his reply and upon which he elaborated at oral argument.

In particular, the Plaintiff contends that his failure to secure an unconditional release from Parkway Realty is not the type of failure that can justify termination of a franchise under the PMPA. For this proposition he relies upon the definition of "failure" found in 15 U.S.C. § 2801(13), which states, in relevant part, that "the term 'failure' does not include . . . any failure for a cause beyond the control of the parties." Thus, the Plaintiff contends that, because Parkway Realty failed to consent to a release of Cumberland Gulf, despite Amphora being ready, willing, and able to assume the Option Terms, its inability to secure the release was necessarily due to factors beyond its control, and should not be considered a "failure" of its obligations under the PMPA.

In the Court's view, this argument is misplaced. As noted above, the general prohibition in the PMPA against franchisors terminating a franchise or not renewing a franchise relationship is augmented by a series of enumerated grounds upon which such termination or nonrenewal is considered appropriate. Among these enumerated grounds are various "failures" on the part of a franchisee. See, e.g., 15 U.S.C. § 2802(b)(2)(A) ("failure" of a franchisee to comply with provisions of the franchise agreement); id. § 2802(b)(2)(B) ("failure" by the franchisee to exert good faith in carrying out the franchise); id. § 2802(b)(3)(C) ("failure" of the franchisee to operate the franchise in a clean, safe, and healthful manner). It is with regard to these enumerated grounds that the statutory definition of the word "failure" is relevant. See Gun Hill Rd. Serv. Station, 2013 U.S. Dist. LEXIS 14199, at *26-*30 (appropriately applying the definition found in 15 U.S.C. § 2801(13)(B) to

"the 'failures' enumerated in Sections 2802(c)(8) and (c)(9)," namely, the failure to make timely payments and the failure to operate the marketing premises for seven consecutive days).

However, none of these particular grounds involving a statutory "failure" is implicated here. By contrast, in this case, Cumberland Gulf terminated Amphora's franchise pursuant to 15 U.S.C. § 2802(b)(2)(C) and (c)(4) – *i.e.*, because the ground lease with Parkway Realty expired and, therefore, the franchisor could not grant possession of the Service Station to Amphora. As discussed above, under those circumstances, Cumberland was only required to offer to assign the Option Terms to Amphora, but was also able to condition the assignment on receipt of an unconditional release. Thus, the statutory provision at issue here does premise liability on the franchisee's performance or nonperformance of a particular task. In fact, the term "failure" does not appear anywhere in the relevant statutory language. Consequently, although material to Cumberland Gulf's decision to terminate the franchise, Amphora's failure to secure the release, and, thereby, to consummate the assignment of the Option Terms, is not a "failure" as that term is defined in the PMPA.

This conclusion is supported by the cases relied upon by the Plaintiff. See, e.g., Sun Refining & Marketing Co. v. Rago, 741 F.2d 670, 673 (3d Cir. 1984) (applying the definition of "failure" to 15 U.S.C. § 2802(c)(8), which authorizes the termination of a franchise based on a franchisee's "failure" to timely make payments); Marini v. Atlantic Richfield Co., 475 F. Supp. 142, 144 (D.N.J. 1979)

(same).  District court cases in this circuit are in accord.  See Gun Hill Rd. Serv. Station, 2013 U.S. Dist. LEXIS 14199, at *26-*30; California Petroleum, 589 F. Supp. at 288.

The Court is also unpersuaded by Amphora's contention that Parkway Realty wrongfully entered into the Bolla Lease without first giving Cumberland Gulf written notice and the opportunity to exercise a preferential right to enter that lease.  Initially, the Court notes that Amphora improperly asserted this claim for the first time in its reply.  See Anghel v. Sebelius, 912 F. Supp. 2d 4, 14 (E.D.N.Y. 2012) (Spatt, J.) (noting that "[i]t is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief" (internal citations omitted)).  However, because the Defendants were afforded an opportunity to submit sur-replies, and to address this issue at oral argument, the Court will now consider it.

In the Court's view, this theory of liability fails for two reasons.  First, it is clear that any preferential rights contained in the Master Lease inure solely to the benefit of Cumberland Gulf, not Amphora.  To the extent that Amphora is neither a party to the Master Lease, nor, as set forth in this opinion, entitled to compel Cumberland Gulf to assign its interest in the Option Terms, Amphora appears to have no standing to enforce the preferential rights provisions of the Master Lease.

To the extent the Plaintiff contends that Cumberland Gulf is required by Section 2802 of the PMPA to assign its preferential rights to the Bolla Lease, it is incorrect.  The PMPA only requires the franchisor to "offer[ ] to assign to the

franchisee any option *to extend the underlying lease* or option *to purchase the marketing premises* that is held by the franchisor." 15 U.S.C. § 2802(c)(4). As the Plaintiff concedes, the scope of this requirement is limited to "any options [the franchisor] hold[s] either to purchase the property or to extend the lease." See Pl. Reply Memo at 7 (quoting 140 CONG. REC. 27316, 27317-18 (1994) (Rep. by Rep. Wyden)). It is clear to this Court that the Bolla Lease is neither one to purchase the property or to extend the Master Lease. Accordingly, in the Court's view, the preferential rights at issue here are outside the purview of 15 U.S.C. § 2802(c)(4).

Based on the foregoing, the Court does not find sufficiently serious questions going to the merits to warrant the relief that the Plaintiff seeks. Therefore, Amphora's motion for a preliminary injunction is denied.

Having so held, the Court at this time need not consider the final element of the preliminary injunction standard, namely, whether, on balance, the hardships imposed upon the Defendants by the issuance of a preliminary injunction would be less than the hardship imposed upon Amphora if such relief were not granted. See Big Apple Petroleum, LLC, 2015 U.S. Dist. LEXIS 61011, at *21.

In addition, the Court at this time need not decide whether it is appropriate for Amphora to post security, and if so, the amount of such a bond.

### III.    Conclusion

For the reasons set forth in this opinion, the Court denies the Plaintiff's motion for a preliminary injunction. The parties are directed to contact the

chambers of United States Magistrate Judge Anne Y. Shields for the purpose of scheduling an initial conference within 10 days of the date of this opinion.

**SO ORDERED**

Dated: Central Islip, New York          */s/ Arthur D. Spatt*
October 19, 2015                         ARTHUR D. SPATT
                                         United States District Judge